IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD L. BRADLEY, ET AL. | No. C 11-00292 SI |
| Plaintiffs, | **ORDER DENYING MOTION TO DISMISS** |
| v. | |
| CONTINENTAL CASUALTY CO., | |
| Defendant. | |

On April 22, 2011, the Court heard argument on defendant Continental Casualty's motion to dismiss. Having considered the arguments of counsel and the papers submitted, the Court hereby DENIES defendant's motion.

**BACKGROUND**

Plaintiff West Coast Scrap Producers, Inc. ("West Coast Scrap") is a dissolved California corporation. Compl. ¶ 1. Plaintiff Richard L. Bradley ("Bradley") was the beneficial owner of all of the stock of West Coast Scrap. *Id.* ¶ 2.

In March 2009, the guardian ad litem for certain minor plaintiffs filed a lawsuit in Sonoma County Superior Court naming as defendants, among others, West Coast Scrap and Bradley. *Id.* ¶ 16 & Ex. 2. The suit was captioned *Gill v. West Coast Welders Supply Co.* (Case No. SCV 244778). The *Gill* plaintiffs allege that West Coast Scrap and Bradley "owned and/or operated scrap metal operations whose operations related to the use, storage, handling and release of Contaminants at 99 Frances Street in Santa Rosa" and on the adjacent property, "1143 Briggs Avenue." *Id.* ¶ 17 (quoting *Gill* complaint ¶ 2, attached as exhibit 2). The *Gill* plaintiffs allege that "Contaminants were released" at the two

properties, which contaminated "properties plaintiffs lived at and/or occupied, and drinking water used and consumed by Plaintiffs and their parents." *Id.* ¶ 18 (quoting *Gill* complaint ¶ 2). The *Gill* plaintiffs also allege that

> 31. . . . Contaminants migrated from [99 Frances] into ground water where it was transferred, in part, via sewer lines and underground utilities onto properties Plaintiffs and their parents lived and/or occupied, and into drinking water used and consumed by Plaintiffs and their parents. Defendants knew or should have known that Plaintiffs' [sic] were likely to have their water contaminated with chemicals known to cause cancer and other serious illness. In failing to prevent continued migration of chemicals from their properties and into Plaintiffs' water and onto properties Plaintiffs and their parents lived and/or occupied, these Defendants breached their duty to control the Contamination their business operations created.
>
> 32. . . . the Defendants knew for several years that Contaminants were migrating from their property in Plaintiffs' drinking water and onto properties Plaintiffs and their parents lived and/or occupied. However, Defendants fraudulently and purposefully failed in their duty to conduct adequate testing and/or environmental assessments of the contamination spreading from the Property with the intent to avoid liability. As such, Defendants failed in their duty to warn Plaintiffs and their guardians that Plaintiffs were likely ingesting Contaminants in their drinking water. In failing to adequately control the contamination emanating from the Property, and in failing to warn Plaintiffs and their guardians that they were probably ingesting Contaminants emanating from the Property, Defendants breached their duty of due care.

*Id.* ¶ 19 (quoting *Gill* complaint ¶¶ 31–32).

Bradley and West Coast Scrap purchased and were named insureds under an umbrella insurance policy that was issued in August 1974. *Id.* ¶ 8. The policy continued in effect until October 1, 1976, at which point another umbrella policy was issued, which continued in effect until at least January 1, 1978. *Id.* ¶¶ 8–9. West Coast Scrap operated scrap metal operations at 99 Frances Avenue and 1143 Briggs Avenue during the umbrella policy periods, but ceased operating prior to the end of the later umbrella policy. *Id.* ¶ 21.

Bradley and West Coast Scrap allege that, according to the terms of the umbrella policies, Continental Casualty is obliged to defend them in the *Gill* litigation. *Id.* ¶ 23. Continental Casualty has refused to do so. *Id.* ¶ 28. Plaintiffs have filed a complaint for declaratory relief and damages, alleging a breach of the duty to defend, and a breach of the implied covenant of good faith and fair dealing.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

**DISCUSSION**

"Liability insurers owe a duty to defend their insureds for claims that potentially fall within the policy's coverage provisions. The carrier must defend a suit which potentially seeks damages within the coverage of the policy. However, in an action where no claim is even potentially covered, the insurer owes no duty to defend." *Hameid v. National Fire Ins. of Hartford*, 31 Cal. 4th 16, 21 (2003).

Defendant moves to dismiss, arguing that no claim in *Gill* is even potentially covered. Defendant argues that, under the terms of the policies, both the wrongful act and the resulting injury must occur during the policy periods. Because the umbrella policies were not in effect after 1978, and because the *Gill* plaintiffs were minors as of 2009, meaning that they were not yet born in 1978 and therefore could not have been injured while the policy was in effect, there is no possible coverage.[1]

Plaintiffs argue that the *Gill* plaintiffs made certain claims that, under California law, constitute

---

[1] For the purpose of this motion, defendant does not challenge any other legal assertions or allegations in plaintiffs' complaint.

3

claims for invasion of private property, and that such claims are covered under the terms of the umbrella policies even where only the wrongful act (but not the resulting injury) occurred during the policy periods.

The relevant terms of the insurance policies are as follows.

2. **Coverage B – Excess Liability Indemnity Over Retained Limit**
The company will indemnify the insured, with respect to any occurrence not covered by underlying insurance . . . for ultimate net loss in excess of the insured's retained limit which the insured shall become obligated to pay as damages by reason of liability imposed upon the insured by law . . . because of
> personal injury
> property damage, or
> advertising injury

to which this coverage applies, caused by an occurrence. The company, with respect to an occurrence not covered in whole or in part by underlying insurance or to which there is no other insurance in any way applicable, shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury, property damage or advertising injury, even if any of the allegations of the suit are groundless, false or fraudulent. . . .

5. **Policy Period**
. . . Coverage B – The coverage applies to personal injury, property damage or advertising injury taking place during this policy period. . . .

**Definitions**
"bodily injury" means bodily injury, sickness or disease, including death and care and loss of services resulting therefrom, sustained by any person . . . .

"occurrence" means

(1) with respect to subsection (1) of the definition of personal injury and with respect to property damage, an accident, including injurious exposure to conditions, which results, during this policy period, in such personal injury, or property damage neither expected nor intended from the standpoint of the insured. All ultimate net loss arising out of continuous or repeated exposure to substantially the same conditions shall be considered as arising out of one occurrence;

(2) with respect to subsection[] (2) . . . of the definition of personal injury, an act or series of acts of the same or similar nature, committed during this policy period which causes such personal injury. All ultimate net loss arising out of such act or series of acts, regardless of the frequency thereof or the number of claimants, shall be deemed to arise out of one occurrence; . . .

"personal injury" means

(1) bodily injury, shock, mental injury or mental anguish;

(2) false arrest, detention or imprisonment, wrongful entry or eviction or other invasion of private occupancy, malicious prosecution or humiliation; except that maliciously inflicted by, at the direction of, or with the consent of the insured; . . . .

4

Compl. Ex. 1, Ex. B.

In *Martin Marietta Corp. v. Insurance Company of North America*, 40 Cal App. 4th 1113 (1995), the California Court of Appeal interpreted a definition of "personal injury" in an insurance contract that was substantially similar to the second definition of personal injury in the umbrella policy in this case. In that case, the California Court of Appeal held that policy language insuring Martin Marietta's liability for "wrongful entry or eviction, or other invasion of the right of private occupancy," provided coverage for certain suits brought by governmental entities which sought to require Martin Marietta to remediate groundwater and other contamination emanating from landfill and other sites. *Id.* at 1117. The court explained that "wrongful entry . . . may include nuisance," and "other invasion of the right of private occupancy . . . may include nuisance claims." *Id.* at 1131–32 (internal quotation marks omitted).

At least for the purposes of this motion, defendant acknowledges that some of the injuries pled in *Gill* may fall under the second definition of personal injury in the umbrella policies. Defendant argues, however, that the injuries in *Gill* could not have occurred while the policy was in effect, because the plaintiffs were not yet living, and therefore it has no duty to defend. Defendant argues that the policy, by its language, only "applies to personal injury . . . taking place during this policy period," and that "personal injury" means the result of an injurious act.

"In questions of insurance coverage the court's initial focus must be upon the language of the policy itself, not upon 'general' rules of coverage that are not necessarily responsive to the policy language." *Am. Cyanamid Co. v. Am. Home Assurance Co.*, 30 Cal. App. 4th 969, 978 (1994). In *American Cyanamid*, the plaintiff alleged that the defendants had duty to defend under any one of eight different policies with different language. The underlying lawsuit was for anticompetitive behavior, brought by a competitor that had not existed during the relevant policy periods.

Two of the policies covered personal injury, property damage, or advertising injury caused by an occurrence, and the policies defined "occurrence" as "an injurious exposure to conditions, which results during the policy period, in personal injury, advertising injury or property damage . . . ." *Id.* at 979. Under these policies, the trigger of coverage was an injury during the policy periods, and the claimed injury could not have occurred during the policy periods, because the competitor "was not even

in existence." *Id.* at 980.[2] Similarly, a third policy defined "advertising injury" as " injury or damage arising out of one or more [enumerated] offenses," meaning "that the triggering event is the injury, not the act." *Id.* at 981.

In contrast, another policy at issue in *American Cyanamid* limited coverage to "occurrences which happen during the policy period," but provided no definition of "occurrence." *Id.* at 980. As to that policy, the court concluded that it could refer to "anticompetitive conduct during the policy period even though the injury . . . resulted later." *Id.* The remaining four policies provided coverage for "offenses committed . . . during the policy period." *Id.* at 981. The policies covered "advertising injury arising out of offenses committed anywhere during the policy period," and "advertising injury" was defined to mean "injury or damage arising out of one or more [enumerated] offenses." *Id.* at 981 n.5. The court explained that language providing coverage for "offenses committed" during the policy period "indicates that the triggering event is the act, not the injury." *Id.* at 982. Thus, "[i]nsofar as [the competitor's] complaint alleges that American Cyanamid's anticompetitive practices before 1986 caused injury to [the competitor] after it was formed in 1986, the complaint alleges that an 'offense' was committed during the policy periods." *Id.*

Under the umbrella policies at issue in this case, the triggering event is "personal injury." Defendant would like the Court to read "personal injury" to mean the result of an injurious act. However, the policy defines "personal injury" further, and the Court may not ignore the language of the policies. One definition of personal injury is "bodily injury." An "occurrence" of bodily injury is one where the bodily injury "results, during th[e] policy period." This language is nearly identical to the language in the first two policies discussed in *American Cyanamid*, and it is clear that defendant does

---

[2] The California Supreme Court has explained that
"trigger of coverage" is a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the potential of coverage to arise. The issue is largely one of timing—what must take place within the policy's effective dates for the potential of coverage to be "triggered"? Whether coverage is ultimately established in any given case may depend on the consideration of many additional factors, including the existence of express conditions or exclusions in the particular contract of insurance under scrutiny, the availability of certain defenses that might defeat coverage, and a determination of whether the facts of the case will support a finding of coverage.
*Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 655 n.2 (1995).

6

not have a duty to defend based on any allegations in *Gill* of bodily injury. Nor do plaintiffs argue that it does.

Rather, plaintiffs rely on a different definition of personal injury, as "wrongful entry or . . . other invasion of private occupancy." An occurrence of this type of personal injury is defined as "an act or series of acts of the same or similar nature, committed during this policy period which causes such personal injury." This language is similar to the "offenses committed" language in the final four policies discussed in *American Cyanamid*. Thus, it does not matter that the *Gill* plaintiffs were not yet born when the insurance policy lapsed, as long as the acts constituting "wrongful entry or . . . other invasion of private occupancy" occurred during the policy period. According to the complaint, they did.[3]

Therefore, defendant's motion to dismiss is DENIED.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendant's motion to dismiss. (Doc. 5.)

**IT IS SO ORDERED.**

Dated: April 22, 2011

SUSAN ILLSTON
United States District Judge

---

[3] The court in *Standard Fire Insurance Co. v. Spectrum Community Association*, 141 Cal. App. 4th 1117 (2006), reframed the analysis used in *American Cyanamid* somewhat, stating that "It is the existence, during the policy period, of the damage, not the complaining party, that is determinative." *Id.* at 1136; *see also id.* at 1120 ("When an action is filed, can an insurer under an occurrence-based commercial general liability policy avoid providing a defense to the insured condominium complex developer by the simple device of claiming that the homeowners association could not have been damaged during the policy period because the homeowners association did not then exist? We think not. This would deprive the developer of the bargained-for insurance coverage and transform the occurrence-based policy into a claims made policy."). It is clear that plaintiff has successfully stated a claim under this approach as well, as the alleged invasion of private property arguably caused damage during the policy periods, even if the minor plaintiffs themselves were not yet around to be injured.